**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GARY SMITH, Individually and on Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) | Case No.  1:20-cv-02104 |
| v. ) ) | **CLASS ACTION COMPLAINT FOR** |
| TIVO CORPORATION, JAMES E. MEYER, RAGHAVENDRA RAU, EDDY W. HARTENSTEIN, DANIEL M. MOLONEY, ALAN L. EARHART, LAURA J. DURR, GLENN W. WELLING, DAVID M. SHULL and LORIA B. YEADON, ) ) ) ) ) ) ) ) ) | **VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** **JURY TRIAL DEMANDED** |
| Defendants. ) | |

Plaintiff Gary Smith ("Plaintiff"), by his undersigned attorneys, alleges upon personal

knowledge with respect to himself, and information and belief based upon, *inter alia*, the

investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and the

other public holders of the common stock of TiVo Corporation ("TiVo" or the "Company") against

the Company and the members of the Company's board of directors (collectively, the "Board" or

"Individual Defendants" and, together with TiVo, the "Defendants") for their violations of

Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C.

§§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, and Regulation G, 17 C.F.R. § 244.100,

in connection with the proposed merger (the "Proposed Transaction") between TiVo and Xperi

Corporation ("Xperi"), to become wholly owned subsidiaries of a newly formed corporation,

XRAY-TWOLF Holdco Corporation ("HoldCo.").

2.      On December 18, 2019, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to receive 0.455 shares of HoldCo. common stock for each share of TiVo stock they own (the "Merger Consideration"). Upon completion of the merger, TiVo shareholders will own approximately 53.5% and Xperi shareholders will own approximately 46.5% of the common stock outstanding.

3.      On February 18, 2020, in order to convince TiVo shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Form S-4 (the "S-4") Registration Statement with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act. The materially incomplete and misleading S-4 violates SEC Rule 14a-9 (17 C.F.R. § 240.14a-9).

4.      While touting the fairness of the Merger Consideration to the Company's shareholders in the S-4, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules and regulations and rendering certain statements in the S-4 materially incomplete and misleading.

5.      In particular, the S-4 contains materially incomplete and misleading information concerning: (i) the financial projections for the Company that were prepared by the Company and relied on by Defendants in recommending that TiVo shareholders vote in favor of the Proposed Transaction; and (ii) the summary of certain valuation analyses conducted by TiVo's financial advisor, LionTree Advisors LLC ("LionTree") in support of its opinion that the Merger Consideration is fair to shareholders, on which the Board relied.

6.      It is imperative that the material information that has been omitted from the S-4 is disclosed prior to the forthcoming vote to allow the Company's shareholders to make an informed decision regarding the Proposed Transaction.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of: (i) Regulation G (17 C.F.R. § 244.100); and (ii) Rule 14a-9 (17 C.F.R. § 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to TiVo shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because a substantial portion of the alleged wrongs took

place in this District and the Company's common stock trades on the NASDAQ Composite, which is headquartered in this District.

## PARTIES

11.    Plaintiff is, and at all relevant times has been, a holder of TiVo common stock.

12.    Defendant TiVo is incorporated in Delaware and maintains its principal executive offices at 2160 Gold Street, San Jose, California 95002. The Company's common stock trades on the NASDAQ under the ticker symbol "TIVO."

13.    Individual Defendant James E. Meyer is TiVo's Chairman and has been a director of TiVo at all relevant times.

14.    Individual Defendant Raghavendra Rau is TiVo's Vice Chairman and has been a director of TiVo at all relevant times.

15.    Individual Defendant Eddy W. Hartenstein has been a director of TiVo at all relevant times.

16.    Individual Defendant Daniel M. Moloney has been a director of TiVo at all relevant times.

17.    Individual Defendant Alan L. Earhart has been a director of TiVo at all relevant times.

18.    Individual Defendant Laura J. Durr has been a director of TiVo at all relevant times.

19.    Individual Defendant Glenn W. Welling has been a director of TiVo at all relevant times.

20.    Individual Defendant David M. Shull has been a director of TiVo at all relevant times.

21.    Individual Defendant Loria B. Yeadon has been a director of TiVo at all relevant times.

22.    The Individual Defendants referred to in paragraphs 13-21 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

23.    Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of TiVo (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

24.    This action is properly maintainable as a class action because:

a.    The Class is so numerous that joinder of all members is impracticable. As of February 18, 2020, there were approximately 128,000,000 shares of TiVo common stock outstanding, held by hundreds of individuals and entities scattered throughout the country. The actual number of public shareholders of TiVo will be ascertained through discovery;

b.    There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)    whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

ii) whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the S-4 in violation of Section 14(a) of the Exchange Act;

iii) whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv) whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading S-4.

c. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g. A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.    The Proposed Transaction

25.    TiVo provides a broad set of cloud-based services, embedded software solutions and intellectual property that bring entertainment together for the watchers, creators and advertisers.  TiVo has a personalized selection of shows from hundreds of live TV channels, tens of thousands of on demand movies and TV episodes and the latest digital content.  The Company works closely with pay TV operators globally to deploy sophisticated cloud-based services and software products using machine learning to provide consumers with content recommendations across online video, television programming, movies and music entertainment in a unified discovery experience.

26.    On December 19, 2019, TiVo and Xperi issued a joint press release announcing the Proposed Transaction, which states in pertinent part:

> SAN JOSE, Calif.--(BUSINESS WIRE)--Xperi Corporation (Nasdaq: XPER) and TiVo Corporation (Nasdaq: TIVO) today announced they entered into a definitive agreement to combine in an all-stock transaction, representing approximately $3 billion of combined enterprise value. The transaction creates a leading consumer and entertainment technology business and one of the industry's largest intellectual property (IP) licensing platforms with a diverse portfolio of entertainment and semiconductor intellectual property.
>
> The merger agreement provides for a 0.455 fixed exchange ratio, which implies a 15% premium to TiVo's shareholders based on each of Xperi's and TiVo's 90-day volume-weighted average share prices. At close, Xperi shareholders will own approximately 46.5% of the combined business, and TiVo shareholders will own approximately 53.5%.
>
> **Compelling Benefits of Combining Two Innovative Product and IP Licensing Leaders**
>
> This transaction combines two technology pioneers who have shaped how millions of consumers access and experience entertainment content, and whose innovations are found in billions of devices around the world. Serving hundreds of businesses ranging from content providers to consumer electronics and automotive manufacturers, the combined entity will provide an amazing entertainment platform for tens of millions of individual consumers and create a powerful platform for the

discovery, delivery, and monetization of content.

The volume of entertainment content has exploded, with more ways than ever before to access it. TiVo's leading content aggregation, discovery, and recommendation capabilities enable viewers to more easily find, watch, and enjoy entertainment. When coupled with Xperi's strong presence and product capabilities in the home, automotive, and mobile device ecosystems, the combined company will have a unique industry platform to address an ever-increasing consumer desire to enjoy entertainment anywhere, anytime, on any device.

Additionally, the combination will create an intellectual property licensing platform that spans a number of the largest addressable markets in entertainment content, consumer electronics, and semiconductors. With more than 10,000 patents and applications between the two companies and minimal licensee overlap, the combined IP business will be one of the largest licensing companies in the world. Further, the combined business will benefit from greater research and development capabilities, as well as customer diversification.

"This landmark combination brings together two highly complementary companies poised to set the industry standard for user experiences across the digital value chain," said Jon Kirchner, Chief Executive Officer of Xperi. "Together, we will be able to integrate TiVo's leading content aggregation, metadata, discovery, and recommendation capabilities with our home, automotive, and mobile technology solutions to help our customers create experiences that excite and delight consumers. Additionally, the combined company will continue to unlock the value of our strategic and sizable patent portfolios by bringing together our deep industry expertise and powerful innovation engines. Through greater scale and diversity, we will deliver attractive and sustainable long-term cash flow and shareholder value."

"There is more content, and more ways to enjoy that content, than ever before," said David Shull, Chief Executive Officer of TiVo. "In a rapidly expanding and fragmenting digital universe, consumers want and need to be able to easily find and enjoy the content that matters to them. TiVo has always been the company that brings entertainment together. Now, we can significantly expand our mission. With Xperi's annual licensing of more than 100 million connected TV units, and complementary relationships with major content providers, consumer electronics manufacturers, and automotive OEMs, our combined company will transform the home, car, and mobile entertainment experience for the consumer."

**Long-Term Vision and Value Creation**

The first step in the combined company's value creation plan will focus on integrating the companies' respective product and IP licensing businesses. Together, the companies expect to benefit from a larger and stronger platform to drive growth and innovation, accelerate time-to-market, and improve IP licensing monetization and outcomes. The product business expects to pursue substantial

cross-selling opportunities especially in its home and automotive markets.

The new company had $1.09 billion in TiVo revenue and 1Xperi billings and more than $250 million in operating cash flow on a pro forma basis for the twelve months ended September 30, 2019. The combined company expects to deliver revenue synergies by bringing new, innovative solutions to consumer electronics and automotive companies to help address the massive shift in media and entertainment distribution and consumption.

Additionally, the companies expect to achieve at least $50 million of annualized run-rate cost savings by year-end 2021 through the integration of their respective product and IP licensing businesses, the majority of which are expected within the first twelve months after closing. These cost savings are incremental to those that are expected as a result of TiVo's ongoing cost-transformation plan.

In light of the business combination, TiVo has suspended its near-term plans to separate its product and IP businesses. Upon closing of the transaction, each company's respective product and IP businesses will be integrated and operated as separate IP licensing and product business units. This will facilitate a potential separation of the combined businesses at a later date.

David Shull said, "TiVo's management team and board have engaged in a comprehensive review of TiVo's businesses over the past year, and we are confident that this combination with Xperi is the right path forward for all our stakeholders. While we previously planned to separate our product and IP licensing businesses in April 2020, we believe today's combination with Xperi will enable us to create even more value for our shareholders in both the near and long term by allowing each to go to market with greater financial and operational scale."

**Transaction Details**

Under the terms of the merger agreement, the shares of TiVo and Xperi stockholders will be converted into the shares of the new parent company based on a fixed exchange ratio of 0.455 Xperi share per existing TiVo share. Upon completion of the merger, Xperi stockholders will own approximately 46.5% and TiVo stockholders will own approximately 53.5% of the new parent company on a fully diluted basis.

In connection with the transaction each company's debt will be refinanced on a combined basis. To meet this objective, the companies have secured $1.1 billion of committed financing from Bank of America and Royal Bank of Canada.

**Management and Board of Directors**

Following the completion of the transaction, Xperi's Chief Executive Officer, Jon Kirchner, will serve as Chief Executive Officer of the new parent company and

Xperi's CFO, Robert Andersen, will serve as Chief Financial Officer. TiVo's Chief Executive Officer, David Shull, will continue as a strategic advisor to ensure a successful integration.

The Board of Directors of the new parent company will consist of seven directors, including Xperi CEO Jon Kirchner, in addition to three directors appointed by Xperi and three directors appointed by TiVo. The Chair of the Board will be selected by the independent directors of the Board.

The new parent company will assume the Xperi name but will continue to provide entertainment services under the TiVo brand, alongside Xperi's premium DTS®, HD Radio®, and IMAX® Enhanced brands. The company will be headquartered in San Jose, California.

**Timing and Approvals**

This transaction has been approved by the Boards of Directors of both companies and is expected to close during the second quarter of 2020, subject to regulatory approvals, the approval by the shareholders of each company, and other customary closing conditions.

**NOL Rights Plan**

Concurrent with the approval of this transaction, TiVo's Board approved the adoption of a Stockholder Rights Plan (the NOL Rights Plan) designed to protect TiVo's $1 billion federal Net Operating Losses (NOLs) from the effect of Section 382 under the US Internal Revenue Code, which can limit the use of the NOLs. The completion of the TiVo deal would move TiVo closer to the 50 percent ownership change outlined in Section 382 and increase the risk of a loss of TiVo's valuable NOLs. TiVo believes that its tax attributes represent an important corporate asset that can provide long-term stockholder benefits and should be protected. The NOL Rights Plan is similar to those adopted by numerous other public companies with significant tax assets. The NOL Rights Plan is set to expire at the earlier of completion or termination of the TiVo transaction.

**Advisors**

Centerview Partners, LLC served as exclusive financial advisor to Xperi and Skadden, Arps, Slate, Meagher & Flom LLP served as legal advisor. LionTree Advisors LLC served as exclusive financial advisor to TiVo and Cooley LLP served as legal advisor.

**Joint Conference Call to Discuss the Transaction**

Xperi and TiVo will host a joint investor conference call today Thursday, December 19, 2019 at 8:00 a.m. Eastern Standard Time to discuss details of the transaction.

Interested parties may join the conference call by dialing +1 800-353-6461 in the U.S. or +1 334-323-0501 internationally, with the conference ID 5119625. The live webcast and related presentation materials can be found on Xperi's Investor Relations website at https://investor.xperi.com and TiVo's Investor Relations website at ir.TiVo.com. A replay of the conference call will be available December 20, 2019 by dialing +1 888-203-1112 in the U.S. or +1 719-457-0820 internationally, with the replay ID 5119625 or via the companies' respective Investor Relations websites.

**About Xperi Corporation**

Xperi Corporation (Nasdaq: XPER) and its brands, DTS, FotoNation, HD Radio, Invensas and Tessera, are dedicated to creating innovative technology solutions that enable extraordinary experiences for people around the world. Xperi's solutions are licensed by hundreds of leading global partners and have shipped in billions of products in areas including premium audio, broadcast, automotive, computational imaging, computer vision, mobile computing and communications, memory, data storage, and 3D semiconductor interconnect and packaging. For more information, please call +1 408-321-6000 or visit www.xperi.com.

Xperi, DTS, Invensas, FotoNation, HD Radio, Tessera and their respective logos are trademarks or registered trademarks of affiliated companies of Xperi Corporation in the United States and other countries. All other company, brand and product names may be trademarks or registered trademarks of their respective companies.

**About TiVo Corporation**

TiVo Corporation (Nasdaq: TIVO) brings entertainment together, making it easy to find, watch and enjoy. We serve up the best movies, shows and videos from across live TV, on-demand, streaming services and countless apps, helping people to watch on their terms. For studios, networks and advertisers, TiVo delivers a passionate group of watchers to increase viewership and engagement across all screens. Go to tivo.com and enjoy watching.

27.    TiVo is well-positioned for financial growth and the Merger Consideration fails to adequately compensate the Company's shareholders.  It is imperative that Defendants disclose the material information they have omitted from the S-4, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for

themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

28.    If the false and/or misleading S-4 is not remedied and the Proposed Transaction is consummated, Defendants will directly and proximately have caused damages and actual economic loss (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## II.    The Materially Incomplete and Misleading S-4

29.    On February 18, 2020, Defendants caused the S-4 to be filed with the SEC in connection with the Proposed Transaction.  The S-4 solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the S-4 before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the S-4 misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### *The Materiality of Financial Projections*

30.    A company's financial forecasts are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction.  Here, the S-4 discloses that "[i]n connection with the evaluation of the mergers . . . TiVo management prepared unaudited prospective financial information for TiVo on a stand-alone basis, without giving effect to the mergers, and also prepared unaudited prospective financial information for Xperi on a stand-alone basis, based on the projections provided by Xperi as adjusted by TiVo management, without giving effect to the mergers, and estimated synergies

arising in connection with the mergers." S-4 106. The projections were provided to the Board and LionTree. *Id.*

31.    When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101). Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers and acquisitions. In regard to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K. *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

32.    Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format." 17 C.F.R. § 229.10(b). Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items." 17 C.F.R. § 229.10(b)(2).

33.    In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

> (i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*

> (ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights

into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

34.    Here, TiVo's shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering that the Board specifically relied on the financial forecasts in reaching its decision to, among other things, approve the Merger Agreement and the transactions contemplated by it.  S-4 76-77.

35.    As discussed further below, the non-GAAP financial projections used do not provide TiVo's shareholders with a materially complete understanding of the assumptions and key factors considered in developing the financial projections, which assumptions, factors and other inputs the Board reviewed.

### The Financial Projections Relied on by the Board

36.    The S-4 discloses that "[i]n connection with the evaluation of the mergers . . . TiVo management prepared unaudited prospective financial information for TiVo on a stand-alone basis, without giving effect to the mergers, and also prepared unaudited prospective financial information for Xperi on a stand-alone basis, based on the projections provided by Xperi as adjusted by TiVo management, without giving effect to the mergers, and estimated synergies arising in connection with the mergers."  S-4 106.  The projections were provided to the Board and LionTree.  *Id.*

37.    The S-4 goes on to disclose, *inter alia*, TiVo's forecasted values for projected non-GAAP (Generally Accepted Accounting Principles) financial metrics for 2020 through 2022 for Adjusted EBITDA, but fails to provide (i) the line items used to calculate these non-GAAP metrics

or (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures. *Id.* at 109. Additionally, the S-4 discloses TiVo's adjusted Xperi forecasted values for projected non-GAAP financial metrics for 2020 through 2024 for Adjusted EBITDA, but fails to provide: (i) the line items used to calculate these non-GAAP metrics or (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures. *Id.* at 109-110.

38.    The S-4 defines TiVo's Adjusted EBITDA as "GAAP operating income (loss) excluding depreciation, amortization of intangible assets, restructuring and asset impairment changes, equity-based compensation, merger, transformation and integration costs and other one-time items identified by TiVo management . . . ." *Id.* at 109 n.2. Nevertheless, the S-4 fails to reconcile Adjusted EBITDA to its most comparable GAAP measure or disclose the line items used to calculate Adjusted EBITDA, rendering the S-4 materially false and/or misleading. *Id.*

39.    The S-4 defines TiVo's adjusted Xperi Adjusted EBITDA as "earnings before interest, taxes, depreciation and amortization, adjusted for stock-based compensation expense and one-time items identified by TiVo management . . . ." *Id.* at 110 n.1. Nevertheless, the S-4 fails to reconcile UFCF to its most comparable GAAP measure or disclose the line items used to calculate UFCF, rendering the S-4 materially false and/or misleading. *Id.*

40.    Thus, the S-4's disclosure of these non-GAAP financial forecasts provides an incomplete and materially misleading understanding of the Company's future financial prospects and the inputs and assumptions for which those prospects are based upon. It is clear that those inputs and assumptions were in fact forecasted and utilized in calculating the non-GAAP measures disclosed and relied on by the Board to recommend the Proposed Transaction in violation of Section 14(a) of the Exchange Act.

41.    The non-GAAP financial projections disclosed on pages 109-10 of the S-4 violate

Section 14(a) of the Exchange Act because: (i) the use of such forecasted non-GAAP financial

measures alone violates SEC Regulation G as a result of Defendants' failure to reconcile those

non-GAAP measures to their closest GAAP equivalent or otherwise disclose the specific financial

assumptions and inputs used to calculate the non-GAAP measures; and (ii) they violate SEC

Regulation 14a-9 because they are materially misleading as without any correlation with their

GAAP equivalent financial metrics, shareholders are unable to discern the veracity of the financial

projections.

42.    As such, this information must be disclosed in order to cure the materially

misleading disclosures regarding both the financial projections developed by the Company as well

as the projections relied upon by the Company's financial advisors.

### The Financial Projections Violate Regulation G

43.    The SEC has acknowledged that potential "misleading inferences" are exacerbated

when the disclosed information contains non-GAAP financial measures[1] and adopted Regulation

G[2] "to ensure that investors and others are not misled by the use of non-GAAP financial

measures."[3]

44.    Defendants must comply with Regulation G.  More specifically, the company must

disclose the most directly comparable GAAP financial measure <u>and</u> a reconciliation (by schedule

or other clearly understandable method) of the differences between the non-GAAP financial

---

[1]    Non-GAAP financial measures are numerical measures of future financial performance
that exclude amounts or are adjusted to effectively exclude amounts that are included in the most
directly comparable GAAP measure.  17 C.F.R. § 244.101(a)(1).

[2]    Item 10 of Regulations S-K and S-B were amended to reflect the requirements of
Regulation G.

[3]    SEC, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (Jan. 22, 2003),
*available at* https://www.sec.gov/rules/final/33-8176.htm ("SEC, *Final Rule*").

measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100. This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures . . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[4]

45.    Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[5] Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as TiVo included in the S-4 here) implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[6]

---

[4]    SEC, *Final Rule.*

[5]    *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, *available at* http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[6]    Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-*

46.    The SEC has required compliance with Regulation G, including reconciliation requirements in other merger transactions. *Compare Youku Tudou Inc., et al.*, Correspondence to SEC 5 (Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP financials relating to a business combination),[7] *with Youku Tudou Inc., et al.*, SEC Staff Comment Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-A and is thus not excepted from Rule 100 of Regulation G.");[8] *see Harbin Electric, Inc.*, Correspondence to SEC 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation of actual and projected EBIT to GAAP net income . . . .").[9]

47.    Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a). Thus, in order to bring the S-4 into compliance

---

*GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted).

[7]    *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000110465916089133/filename1.htm.

[8]    *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/filename1.pdf.

[9]    *Available at* https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/filename1.htm. *See also Actel Corporation*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures. Please revise to provide the disclosure required by Rule 100 of Regulation G."), *available at* https://www.sec.gov/Archives/edgar/data/907687/000000000010060087/filename 1.pdf. *See also The Spectranetics Corp.*, SEC Staff Comment Letter 1 (July 18, 2017) ("Item 4. The Solicitation or Recommendation Certain Spectranetics Forecasts, page 39 . . . [P]rovide the reconciliation required under Rule 100(a) of Regulation G"), *available at* https://www.sec.gov/Archives/edgar/data/789152/000000000017025180/filename1.pdf.    The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions, which reflect the SEC's official position. Any claim that the SEC has officially sanctioned the use of non-GAAP financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such as the Proposed Transaction is incorrect. The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI's") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from Regulation G. The SEC itself expressly disclaims C&DI's as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on. *See* www.sec.gov/divisions/corpfin/cfguidance.shtml (last visited Mar. 9, 2020).

with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

### *The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9*

48.     In addition to the S-4's violation of Regulation G, the lack of reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures render the financial forecasts disclosed materially misleading as shareholders are unable to understand the differences between the non-GAAP financial measures and their respective most comparable GAAP financial measures. Nor can shareholders compare the Company's financial prospects with similarly situated companies.

49.     Such projections are necessary to make the non-GAAP projections included in the S-4 not misleading for the reasons discussed above. Indeed, Defendants acknowledge that "The non-GAAP financial measures are not intended to be considered in isolation from, as substitutes for, or as superior to, comparable GAAP measures. While TiVo believes that these non-GAAP financial measures provide meaningful information . . . there are limitations associated with the use of these non-GAAP financial measures. These non-GAAP financial measures are not prepared in accordance with GAAP, are not reported by all of TiVo's competitors and may not be directly comparable to similarly titled measures of TiVo's competitors given potential differences in the exact method of calculation." S-4 107.

50.     As such, financial projections are plainly material, and shareholders would clearly want a complete and non-misleading understanding of those projections.

51.     In order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on page 109-10, Defendants must provide a reconciliation table of the non-GAAP financial measures to the most comparable GAAP measures.

### The Materially Misleading Financial Analyses

52.     The summary of the valuation methodologies utilized by LionTree, including the utilization of certain of the non-GAAP financial projections described above by LionTree, in connection with its valuation analyses (*id.* at 79-80) is misleading in violation of Regulation 14a-9.  The opacity concerning the Company's internal projections renders the valuation analyses described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently.  Once an S-4 discloses internal projections relied upon by the Board, those projections must be complete and accurate.

53.     With respect to LionTree's past relationships with Xperi, the S-4 fails to disclose what, if any, compensation LionTree has received from Xperi, and the timing and nature of LionTree's past relationships with Xperi.  *Id.* at 91.

54.     The S-4 states that LionTree preformed a discounted cash flow analysis on TiVo and Xperi, and valued the estimated synergies and dis-synergy avoidance.  With respect to LionTree's *Sum-of-the-Parts DCF Analysis* of TiVo, LionTree valued both Tivo's Product business ("ProductCo") and Tivo's IP Licensing business ("IPCo") by calculating the present value of the projected unlevered free cash flows and the terminal value as of December 31, 2022, both excluding and including Tivo's ongoing litigation matters with Comcase Corporation and multiple Canadian operators, and the potential receipt of proceeds therefrom (the "Litigation Opportunity").  *Id.* at 84.  When valuing ProductCo, LionTree applied a range of terminal multiples of 8.0x to 10.0x to ProductCo's 2022 estimated EBITDA and used a discount rate range of 9.0% to 11.0% based on TiVo's estimated weighted average cost of capital.  *Id.* at 84-85.  When valuing

IPCo, LionTree applied a range of terminal multiples of 4.75x to 5.75x to IPCo's 2022 estimated EBITDA (both excluding and including the Litigation Opportunity) and used a discount rate range of 9.0% to 11.0% based on TiVo's estimated weighted average cost of capital. *Id.* at 85. In each case, Liontree added the estimated net present value of TiVo's tax attributes. *Id.* LionTree subtracted the estimated consolidated net debt from the consolidated enterprise value and divided by the number of fully diluted TiVo shares outstanding. *Id.*

55. With respect to LionTree's *Sum-of-the-Parts DCF Analysis* of Xperi, Liontree valued each of Xperi's Product, Edge Processing, and IP Licensing segments by calculating the present value of the projected unlevered free cash flows and the terminal value as of December 31, 2024. *Id.* at 87. LionTree used a terminal multiple range of 9.0x to 11.0x to the 2024 estimated EBITDA attributable to the Product and Edge Processing segments, and a terminal multiple range of 3.0x to 5.0x to the 2024 estimated EBITDA attributable to the IP Licensing segment. *Id.* LionTree applied a discount rate range of 8.75% to 10.75% to all three segments, based on Xperi's estimated weighted average cost of capital. *Id.* LionTree subtracted the estimated consolidated net debt from the consolidated enterprise value and divided by the number of fully diluted Xperi shares outstanding. *Id.* at 88.

56. With respect to LionTree's *Estimated Synergies Valuation*, LionTree valued the cost synergies and the revenue synergies. *Id.* at 88-89. With respect to the valuation of the cost synergies, LionTree calculated terminal values for these synergies (net of the costs to achieve such synergies) by applying a terminal value multiple range of 6.0x to 8.0x to the 2024 estimated cost synergies. *Id.* at 89. LionTree applied a discount rates range of 8.9% to 10.9%, based on the estimated average of Xperi's and TiVo's weighted average cost of capital. *Id.* With respect to the valuation of the revenue synergies, LionTree calculated terminal values for these synergies by

applying a terminal value multiple range of 7.0x to 9.0x to the 2024 estimated revenue synergies. *Id.* LionTree applied a discount rate range of 8.9% to 10.9%, based on the estimated average of Xperi's and TiVo's weighted average cost of capital, and assuming a contribution margin of fifty-percent based on the estimate of TiVo's management. *Id.*

57.    With respect to LionTree's *Dis-Synergy Avoidance Valuation*, LionTree calculated terminal values for the dis-synergy by applying a terminal multiple range of 6.0x to 8.0x to 2022 estimated EBITDA for the dis-synergy. *Id.* LionTree applied a discount rate range of 8.9% to 10.9%, based on the estimated average of Xperi's and TiVo's weighted average cost of capital. *Id.*

58.    With respect to LionTree's discounted cash flow analysis of TiVo, the S-4 does not disclose, for any segment, the definition or value of the unlevered free cash flows, whether the EBITDA value used in the terminal value is the same as Adjusted EBITDA from the forecasts, the calculated range of terminal values, the inputs used to calculate the Company's weighted average cost of capital, how stock based compensation was treated, the net present value of TiVo's tax attributes, TiVo's consolidated net debt or the number of fully diluted TiVo shares outstanding.

59.    With respect to LionTree's discounted cash flow analysis of Xperi, the S-4 does not disclose, for any segment, the definition or value of the unlevered free cash flows, whether the EBITDA value used in the terminal value is the same as Adjusted EBITDA from the forecasts, the calculated range of terminal values, the inputs used to calculate the Xperi's weighted average cost of capital, how stock based compensation was treated, Xperi's consolidated net debt  or the number of fully diluted Xperi shares outstanding.

60.    With respect to LionTree's synergy valuation, the S-4 does not disclose the 2024 estimated cost synergy, the calculated terminal values for either synergy, or the inputs and assumptions used to select the terminal value multiple range for either synergy.

61.    With respect to LionTree's dis-synergy avoidance valuation, the S-4 does not disclose the calculated terminal values or the inputs and assumptions used to select the terminal value multiple range.

62.    Since information was omitted, shareholders are unable to discern the veracity of LionTree's discounted cash flow analyses. Without further disclosure, shareholders are unable to compare LionTree's calculations with the Company's financial projections. The absence of any single piece of the above information renders LionTree's discounted cash flow analyses incomplete and misleading. Thus, the Company's shareholders are being materially misled regarding the value of the Company.

63.    As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value . . . ." *Id*. (footnote omitted). As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . . . The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

64.     Therefore, in order for TiVo shareholders to become fully informed regarding the fairness of the Merger Consideration, the material omitted information must be disclosed to shareholders.

65.     In sum, the S-4 independently violates both: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to its most directly comparable GAAP equivalent; and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the S-4 independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the S-4 to garner votes in support of the Proposed Transaction from TiVo shareholders.

66.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

67.     Further, failure to remedy the deficient S-4 and consummate the Proposed Transaction will directly and proximately cause damages and actual economic loss to shareholders (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and
17 C.F.R. § 244.100 Promulgated Thereunder)**

68.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

69.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any [S-4] or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

70.    As set forth above, the S-4 omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a). SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most comparable" GAAP measure. 17 C.F.R. § 244.100(a).

71.    The failure to reconcile the non-GAAP financial measures included in the S-4 violates Regulation G and constitutes a violation of Section 14(a).

72.    As a direct and proximate result of the dissemination of the false and/or misleading S-4 Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT II

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

73.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

74.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9(a).

75.     Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).

76.     Defendants have issued the S-4 with the intention of soliciting shareholder support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the S-4, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

77.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were

misstated or omitted from the S-4 but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

78.    The Individual Defendants knew or were negligent in not knowing that the S-4 is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

79.    The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the S-4, rendering the sections of the S-4 identified above to be materially incomplete and misleading.

80.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the S-4.  The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the S-4 or failing to notice the material omissions in the S-4 upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

81.    TiVo is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the S-4.

82.    The misrepresentations and omissions in the S-4 are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

83.    As a direct and proximate result of the dissemination of the false and/or misleading

S-4 Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

<b><u>COUNT III</u></b>

<b>(Against the Individual Defendants for Violations<br>of Section 20(a) of the Exchange Act)</b>

84.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

85.     The Individual Defendants acted as controlling persons of TiVo within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors and/or officers of TiVo, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

86.     Each of the Individual Defendants was provided with or had unlimited access to copies of the S-4 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

87.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act

violations alleged herein and exercised the same. The S-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing the S-4.

88.    In addition, as the S-4 sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The S-4 purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

89.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

90.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.    Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the S-4;

C.      Directing Defendants to account to Plaintiff and the Class for all damages sustained

as a result of their wrongdoing and to award damages arising from proceeding with the Proposed

Transaction;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable

attorneys' and expert fees and expenses; and

E.      Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  March 9, 2020

Respectfully submitted,

**FARUQI & FARUQI, LLP**

By: _/s/ James M. Wilson, Jr._____
Nadeem Faruqi
James M. Wilson, Jr.
685 Third Avenue, 26th Floor
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331
Email: nfaruqi@faruqilaw.com
        jwilson@faruqilaw.com

*Counsel for Plaintiff*

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Gary Smith ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed a draft complaint against TiVo Corporation ("TiVo") and its board of directors and has authorized the filing of a complaint substantially similar to the one I reviewed.

2.  Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.  Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.  Plaintiff's transactions in TiVo securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6.  In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, except as specified below:

7.  Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 8th day of March, 2020.

Gary Smith

| Transaction (Purchase or Sale) | Trade Date | Quantity |
|---|---|---|
| Purchase | 04/23/29 | 500 |
|  |  |  |
|  |  |  |